**SACK & SACK, ESQS.**
110 East 59th Street, 19th Floor
New York, New York 10022
Tel.: (212) 702-9000
*Attorneys for Plaintiff, Paul Bienstock*

**09 CV 2858**

JUDGE STEIN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

**PAUL BIENSTOCK,**

                             Plaintiff,

                   vs.

**MOODY'S INVESTORS SERVICES** and
**MOODY'S CORPORATION,**

                          Defendants.

-------------------------------------------------------------X



Civ No.

**COMPLAINT**

JURY TRIAL REQUESTED

Plaintiff Paul Bienstock ("*Plaintiff*" or "*Bienstock*"), by his attorneys Sack & Sack, Esqs., as and for his complaint against Moody's Investors Services ("*MIS*") and Moody's Corporation ("*Moody's*" together with MIS, "*Defendants*") alleges as follows:

## NATURE OF ACTION

1.     Bienstock brings this action against his former employer following his unlawful and retaliatory termination in connection with his employment in violation of Section 806 of the Corporate and Criminal Fraud Accountability Act of 2002, Title VIII of the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A, et seq. ("*SOX*").

2.     Plaintiff's termination was in retaliation of his complaining and reporting violations of securities fraud and violations of rules or regulations of the Securities

Exchange Commission ("*SEC*") and Federal law ("*protected activity*") and 17 CFR § 270, § 275 and § 279, promulgated by the Securities Exchange Commission ("*SEC Code of Ethics*"), and § 17(d) of the Investment Company Act ("*Investment Company Act*").

3.      By way of background, Moody's, together with its wholly-owned business segment, MIS, is a self-proclaimed leader in sources for credit ratings, research and risk analysis, whose purported mission is to contribute to stable, transparent and integrated financial markets, protecting the integrity of credit.

4.      Moody's, together with its wholly-owned business segment, MIS, also provides research data and analytic tools for assessing credit risk and publishes market credit opinions, deal research and commentary supposedly servicing more than 9,300 customer accounts at over 2,400 institutions worldwide.

5.      Though Moody's, together with its wholly-owned business segment, MIS, touts that its **"independence and integrity have earned us the trust of capital market participants worldwide,"** the incidences described herein as experienced by Bienstock, as an insider, firsthand, confirm otherwise.

6.      After Bienstock witnessed, first hand, outrageous conduct on the part of his management, as more fully set forth herein, he immediately, both verbally and in writing, brought these certain ethical, legal and industry violations and complaints to Moody's Compliance Department (which has the primary responsibility for enforcing the SEC and other industry and company regulations and guidelines).  Within days of his lawful and protected complaints, Bienstock was retaliated against for being a whistle-blower.   Bienstock was summarily terminated from his employment without any legitimate business justification, notice, reason or cause.

2

7.     The SEC Code of Ethics cautions investment advisers that **"that it is incumbent on them to create an environment that encourages and protects supervised persons who report violations.   Advisers should consider how they can best prevent retaliation against someone who reports a violation. . ."**

8.     In violation of the 1940 Act and the SEC Code of Ethics, Defendants failed to lawfully establish, maintain and enforce guidelines, policies and procedures to protect supervised persons, namely Bienstock, who complain about such unlawful activity.

9.     Defendants further violated § 240A-1 of the 1940 Act and the SEC Code of Ethics by failing to protect a supervised person, namely Bienstock from retaliation for his reporting of violations, and thus, failing to create an environment that encourages reporting and protects supervised persons who report violations from retaliation.

10.     Furthermore, the claims made herein are based upon Defendants' breach of the express terms and conditions of Bienstock's contract for compensation in respect of his employment and continued employment.

11.     Although duly demanded both orally and in writing, Defendants have failed and/or continue to refuse to pay to Bienstock the sums of money unconditionally due him for earned salary, overtime, health insurance, bonuses and profit participation.

12.     Alternatively, Defendants owe to Bienstock the equivalent sum of money, which Bienstock would have received "but for" the unlawful retaliatory termination of his employment, which sums Defendants have secreted, retained and kept for its own benefit and use.

3

13.   The amounts that were and would be earned by Bienstock represent wages, bonuses, benefits, wage supplements, and compensation bargained for, earned and belonging to Bienstock.

## JURISDICTION, VENUE AND CHOICE OF LAW

14.   Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1337, § 209(e)(l) and § 214 of the 1940 Act, 15 U.S.C. § 80b-9(e)(l) and § 80b-14.

15.   According to Moody's Corporation *own* public filings with the Securities Exchange Commission, MIS is a wholly-owned "***segment***" of Moody's Corporation and is therefore subject to the provisions of SOX.

16.   According to Moody's Corporation's 10-K Annual Report filed with the United States Securities and Exchange Commission, Moody's Corporation operates in two reportable segments: Moody's Investors Services (MIS) and Moody's KMV ("*MKMV*").

17.   As a wholly-owned *segment* of Moody's Corporation, MIS' significant financial contribution Moody's operating performance and financial condition, render it squarely within the backdrop against which Congress enacted SOX.

18.   Consequently, venue is appropriate in this district under 28 U.S.C. § 1391(a) and § 214 of the 1940 Act, 15 U.S.C. § 80b-14.  The acts which give rise to this Complaint as well as certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws took place in this District.

**19.**   This Court has supplemental jurisdiction over Bienstock's state law claims pursuant to 28 U.S.C. § 1367.

4

# FACTS COMMON TO ALL COUNTS[1]

### PROFESSIONAL BACKGROUND

20.     Bienstock is an accomplished, competent and well-credentialed equity analyst.

21.     In May 1986, Bienstock graduated from Brandeis University, cum laude, with a B.A. in American Studies, and a minor in Legal Studies.

22.     In May 1990, Bienstock received a Masters in Business Administration (MBA) in Finance from the Stern School of Business at New York University.

23.     In addition to his MBA, Bienstock is also a certified financial analyst (CFA), having passed all three levels of the CFA exam in three consecutive years and received his formal designation in September 1993.

24.     Over the past several years, Bienstock continued his involvement with the CFA Institute by reviewing and recommending changes to the current curriculum for prospective CFA candidates.

25.     Bienstock has also kept current on industry issues through attending conferences, seminars and courses offered by the CFA Institute and the New York Society of Security Analysts.

26.     Prior to joining Moody's in or around September 2004, Bienstock had fourteen years of experience as an equity research analyst, and two years of experience of marketing and distributing mutual funds.

---

[1] All directly quoted statements, unless otherwise specified, are the sum and substance of such statements as recalled by Plaintiff.

27.    In his last position at Nippon Life Insurance, which Bienstock held from May 2003 to September 2004, Bienstock managed the healthcare and consumer sub-sectors of a large capitalization core equity fund. Bienstock's investment recommendations enhanced the performance of the overall portfolio as the appreciation in both sub-sectors exceeded the gains recorded by the benchmark.

28.    Prior to that time, from June 1998 to June 2002, Bienstock was employed at Nikko Global Asset Management where he was responsible for managing a $1 billion core equity large capitalization portfolio and the U.S portion of an international convertible fund; both of these portfolios out-performed their benchmarks.

29.    From May 2001 – May 2002 his last year at Nikko, Bienstock was the leader of the U.S. equity team and supervised a staff of two research analysts and one assistant portfolio manager/trader.

## BIENSTOCK'S EXTENSIVE EXPERIENCE AND EMPLOYMENT AT MOODY'S

30.    From September 13, 2004, through his unlawful and retaliatory termination on December 12, 2007, Bienstock was employed by Moody's as a Vice President and Senior Analyst.

31.    By the time Bienstock joined Moody's in September 2004, Bienstock was already familiar with many of the companies in his assigned portfolio as well as many of the names that he served as a support analyst after following healthcare companies of all sizes and in all the relevant sub-sectors for over 14 years (pharmaceutical, biotechnology, managed care, hospitals, nursing homes, medical devices and other services companies).

32.     From day one at Moody's, as a result of Bienstock's extensive experience, as well as his diligence, hard-work, strong business acumen, expert analytical skills and in-depth knowledge of Moody's ratings business, Bienstock was able to develop cogent and well thought out insights and recommendations concerning his portfolio.

33.     Furthermore, Bienstock was quite comfortable in leading and conducting due diligence meetings that were held at Moody's with members of senior management of the companies that Bienstock followed since he had frequently interfaced with company management in person at their headquarters and operating facilities when he was at Nippon Life, Nikko Global Asset management, Rochdale Investment Management, and Moran Asset Management.

34.     Due to Bienstock's experience, diligence, hard-work, strong business acumen and expert analytical skills as an equity analyst, Bienstock was quite comfortable in summarizing his recommendations in detailed reports and then supporting these ideas in front of an Investment Committee of his peers and superiors.  Bienstock also had experience in making formal presentations to pension fund consultants, prospective and current clients and senior management regarding the strategy, performance, and goals of the portfolios that Bienstock managed.

35.     As a senior analyst at Moody's, Bienstock's primary responsibility was to manage a portfolio of over 40 companies in the medical device and healthcare services sub-sectors; more than *double* those of his similarly situated colleagues who were responsible for portfolio of healthcare names.

36.     Over 90% of the companies Bienstock covered had speculative grade ratings of Ba1 or lower, which meant that in addition to recommending an overall global

corporate family rating, Bienstock had to apply Moody's Loss Given Default Rating Methodology in determining the ratings of each debt instrument issued by the company, including bank revolving credit facilities, secured bank loans, unsecured bonds and notes, and convertible issues.

37.     Bienstock followed a significantly larger, more diverse and more complex portfolio of companies than the other three full time healthcare analysts in his group.  For example, two of the other investment grade analysts covered only 20 to 23 names, compared to Bienstock's 40+ companies.  The remaining high yield analyst followed less than 30 names, with over 80% of his names in two sub-sectors; hospitals and nursing homes.

38.     The portfolio names that Bienstock covered fit into the following sub-sectors:  medical devices, pharmaceutical benefit managers (PBMs), contract research organization (CROs),  outpatient mental health providers, home health care, specialty managed care organizations, laboratory services, and other providers.

39.     In addition, due to acquisitions, the names in Bienstock's portfolio grew much larger, diverse and complex.  For example, Quest Diagnostics through a series of acquisitions, moved from being a pure provider of laboratory services to manufacturing point of care tests as well as become a large provider of specialty tests and anatomic pathology.  In addition, Medco Health Solutions moved from being a traditional PBM to offering both distribution of chronic injectable specialty pharmaceuticals and diabetic tests and equipment.

40.     At any time during Bienstock's employment at Moody's when he would be required to recommend an affirmation or change of a company's rating and/or outlook

concerning a particular company grade rating, Bienstock would develop an extensive and thorough research package for review by the Rating Committee to support his conclusions. Bienstock then would present the support for his recommendation in front of a Rating Committee consisting of a Rating Chair, Bienstock, the back-up analyst, the associate analyst, and other analysts who were part of his group.

41.    During his tenure at Moody's, Bienstock had participated in approximately 200 Rating Committee meetings.

42.    Despite Bienstock's experience, diligence, hard-work, strong business acumen, expert analytical skills and in-depth knowledge of Moody's ratings business, Bienstock was unlawfully terminated on December 12, 2007.

43.    Bienstock's termination was based solely upon and in retaliation for his insistence that Moody's follow its own and the industry regulations and guidelines concerning securities laws.

44.    Despite pressure from his supervisors to do otherwise, and then reporting these unethical and unlawful activities to Moody's compliance department, Bienstock, a whistleblower, was terminated for doing what he was trained to do.

45.    Clearly, any other reason proffered by Moody's for Bienstock's surreptitious termination is pre-textual.

### MOODY'S UNETHICAL AND UNLAWFUL ACTIVITY

46.    At all times relevant herein, Bienstock was employed as a Vice President and Senior Analyst reporting to Patrick Finnegan ("*Finnegan*"), Team Managing Director of the Corporate Finance Group. In November 2007, Finnegan began to report up to

Tom Marshella ("*Marshella*"), who is Moody's Group Managing Director, Corporate Finance Group.

47.     Prior to November 2007, Finnegan reported to Daniel Curry, who was also a Moody's Group Managing Director in the Corporate Finance Group.

## I.
### BIENSTOCK'S DECEMBER 4, 2007 PRESENTATION TO THE RATINGS COMMITTEE

48.     On December 4, 2007, Bienstock presented Express Scripts, Inc. to the Rating Committee for its consideration of upgrading the company's bond rating from Ba1 to one notch above, Baa3.  The majority of the rating committee members were quite familiar with Express Scripts as one rating discussion and one Rating Committee Meeting had already been convened during October 2007.

49.     Prior to this December 4, 2007 Rating Committee Meeting, Bienstock attended, participated and orchestrated over 200 Rating Committee meetings and was fully aware of the normal and regulatory practices and procedures required to prepare for and present at such Rating Committee meetings.

50.     On or about that date, December 4, 2007, Bienstock submitted an extensive Ratings Committee package, including detailed financial projections, to support his conclusion that Express Scripts be upgraded from speculative grade to investment grade.  This information package was also forwarded to the Ratings Committee prior to the December 4, 2007 meeting.

51.     Since Express Scripts was a cross-over name, Bienstock invited Marshella, the Group's Managing Director who oversees several teams including his

group, the Healthcare, Packaging and Services Group, and Daniel Gates ("*Gates*"), the Chief Credit Officer, to the Rating Committee presentation.

52.     Both Marshella and Gates received Bienstock's invitation but declined to attend due to prior commitments.

53.     Due to the unavailability of Gates and Marshella, Bienstock's direct supervisor and boss, Finnegan, served as the Rating Chair at the December 4, 2007 Rating Committee meeting.

54.     Also in attendance at the Rating Committee meeting held on December 4, 2007 were five other analysts as well as the associate analyst, who supported Bienstock's work; all of whom worked for, or reported to, Finnegan.

55.     On December 4, 2007, Bienstock deliberately convened a Rating Committee larger than almost every other prior committee that Bienstock had held at Moody's in order to give the company [Express Scripts] a broad forum and fair review and appraisal, as well as to permit participation by analysts who followed the company's competitors, suppliers, distributors and clients.

56.     Beginning at 2:00 PM, Bienstock commenced his in-depth, detailed presentation, going through, analyzing, explaining and fielding an abundance of questions concerning his research and prepared materials in support of his recommendations.

57.     After Bienstock's comprehensive, thoughtful and well-reasoned presentation concerning his recommendation of upgrading Express Scripts' rating,

Bienstock's comprehensive analysis and quantitative market indicators confirmed that Bienstock's recommendation of a higher rating was justified.

58.     The initial vote of the Rating Committee members concerning the upgrade concurred with Bienstock's recommendation; "five" *in favor* of the recommendation and "two" *against* the recommendation.

59.     Rating voting is done by a show of hands, publicly and with transparency so that each member knows whether the other Rating Committee member is voting "in favor of" or "against" a recommendation from the presenting analyst.

## II.
### BIENSTOCK'S DIRECT SUPERVISOR UNLAWFULLY PERSUADES A "RE-VOTE" USING INTIMIDATION AND UNDUE INFLUENCE

60.     In respect of the vote that took place immediately following Bienstock's presentation, Finnegan, the Rating Committee Chair (and Bienstock's boss), was one of the two individuals voting to maintain the same rating of Ba1.

61.     Finnegan voted *against* an upgrade even though the current rating of Ba1 positive is two ranks below the ratings assigned by Moody's two rating agency competitors, Standard & Poor's and Fitch's.

62.     Indeed, Finnegan voted to lower the Express Scripts' outlook from positive to stable, which would have actually represented a lower rating than the current Ba1 rating with a positive outlook.

63.     When questioned by Bienstock in front of all those present at the meeting, Finnegan provided no rationale for his determination to lower Express Scripts' outlook from positive to stable.

12

64.     The other analyst who voted "against," voted to keep Express Scripts' rating unchanged at Ba1 with a positive outlook.

65.     Indeed, Bienstock was perplexed by Finnegan's unsupported position. As a result, Bienstock publicly asked Finnegan why he did not vote for the ratings increase.

66.     Finnegan immediately expressed to the Rating Committee and everyone present that, in accordance with policy, Finnegan desired to appeal the vote to Gates, the Chief Credit Officer.

67.     This appeal process would have been the only appropriate protocol to follow as Moody's established procedure and industry protocol mandated.

68.     However, an irrational Finnegan, in a complete turnaround and without any analytics whatsoever to support his lone opinions, negatively proclaimed to all present at the Ratings Committee meeting that the company [Express Scripts] **"did not deserve an upgrade"** despite the positive company-specific factors and strong industry fundamentals and earnings forecasts that Bienstock thoroughly researched and reported.

69.     Finnegan then sternly and shockingly proclaimed to all present at the December 4, 2007 Ratings Committee meeting, **"Express Scripts doesn't pay us [Moody's] and we don't cover their issues. They don't visit us and they don't deserve our upgrade."**

70.     Bienstock and all others present were shocked and mortified that Finnegan would make such ethically sensitive and questionable public proclamations.

71.     Immediately, Bienstock expressed his dismay of Finnegan's actions by responding in front of all present, **"You know that our upgrade considerations have nothing to do with whether or not we [Moody's] receive business from the companies we follow as that would be an obvious conflict of interest.  Our [Moody's] files reveal that Express Scripts visited with us in June, 2005 and in December, 2006."**

72.     In response, Finnegan, in his typical controlling, monologue fashion, dismissed Bienstock's remarks.  In front of everyone, Finnegan stated, **"Yes, but they haven't come in to present their current case."**

73.     In response, Bienstock unsuccessfully protested, **"The company has been very generous with their time, calling Moody's on a regular basis over the past several months and providing us with detailed financial data points, all of which are included in these presentation materials."**

74.     Further, Express Scripts was more than willing to visit with Moody's and present its case.  Express Scripts, however, informed Moody's that it felt that it would be more beneficial to meet with Moody's after their 2008 Earnings Guidance call (which occurred at the end of November 2007) as by that time it would have developed a full set of financial projections for 2008 and could have discussed with Moody's in elaborate detail all of the assumptions behind these projections.

75.     As a result, Moody's would be able to review the key operating drivers for 2008 as well as discuss Express Scripts' financial policies and intended use of its cash.

76.     Finnegan immediately called for another vote, which is contrary to all ethical, company and industry regulations, protocols, standards and guidelines.

77.     Remarkably, in an incredible reversal, and without any further substantive discussion or presentation of additional materials or data, upon the unprecedented "re-vote", the other Rating Committee members (all of whom were subordinates of Finnegan) flip-flopped, this time voting "six" against and "one" for the ratings change for Express Scripts.

78.     In the re-vote, Bienstock was the lone vote for the ratings change.

79.     One of the analysts, Michael Levesque, who had cast a "secret" ballet during the first vote, was not present at the second vote.  In violation of Moody's policy, Finnegan applied Levesque's secret ballet for the first vote to the second vote.

80.     The only difference between vote #1 and vote #2 was the fifteen minutes of venomous, opinion-based, terrorization by Finnegan to strong-arm Bienstock's fellow Rating Committee members and subordinates to vote with Finnegan and against the rating upgrade for Express Scripts.

81.     Five of the analysts who originally voted in favor of the upgrade of Express Scripts, elected to maintain the existing rating of Ba1 with a positive outlook. Finnegan actually voted to change the outlook from positive to negative, which would have represented a downgrade in Express Scripts' rating.

82.     Finnegan provided no rationale for the change in the outlook.

83.     It is unlawful for an analyst to have a personal opinion based upon animus different from that of a stated, published research analysis.

84.     Finnegan's personal animus towards Express Scripts played a part in his decisions to call a "re-vote."  Specifically, Finnegan has had a contentious relationship with Express Scripts' management for some time.

85.     As far back as June 2005, when responding to questions and queries from Express Scripts' management why the company was not upgraded to investment grade, Finnegan blatantly reprimanded them for not providing more confidential and non-public information regarding the profitability of their top 100 clients and other information.

86.     Finnegan also felt that Express Scripts was "not cooperative enough" in assisting Moody's during the ratings process.

87.     As an experienced senior member of the team, Bienstock was both distraught and mortified by Finnegan's unlawful actions.  The presentation of a fully researched recommendation for Express Scripts that resulted in a majority vote in one instance was completely reversed without any research or support or foundation in violation of the rules, regulations and policy then in effect.

88.     With seventeen years of experience and having sat in on or participated in over 1,000 committee meetings in his career, Bienstock had never witnessed a flip-flop and strong-arm reversal by a Rating Committee chair forcing a revote without any precedent or justification.

### III.
### BIENSTOCK'S LAWFUL COMPLAINTS OF UNLAWFUL ACTIVITY

89.     As is common knowledge at Moody's, Finnegan wielded significant power and frequently exercised his undue influence as Chair of the Rating Committee while his six fellow voting members, all much junior and who report to Finnegan, voted in lock-step with Finnegan like a penguin parade at the North Pole.

90.     After contemplating the apparent breach of well-established policies, procedures and guidelines Bienstock had witnessed at the December 4th meeting, Bienstock was compelled to immediately bring this episode to the attention of Moody's Compliance Department.

91.     Moody's Compliance Department purportedly has the primary responsibility for enforcing industry and company ethical and legal guidelines, rules and laws.

92.     The following day, on December 5, 2007, Bienstock provided the details of the preceding day's events to Scott McKelsey ("*McKelsey*"), Head of Compliance at Moody's.

93.     McKelsey took copious notes and was astonished to hear Bienstock's tale of Finnegan's successful efforts to obviate the regulated voting process.  McKelsey knew these were serious compliance, legal and ethical violations with respect to Finnegan's and the Ratings Committee's actions.

94.     At that time, McKelsey advised Bientsock to immediately share this sordid tale with Gail Weiss ("*Weiss*"), another Compliance Officer responsible for these particular types of matters.

17

95.     On December 5, 2007, that same day, Bienstock had a detailed conversation with Weiss by telephone regarding Finnegan's actions during the Ratings Committee's unorthodox voting process of Express Scripts.

96.     Bienstock was never interviewed or questioned by anyone else at Moody's.

97.     Having heard nothing in reply to his prior lawful complaints and protected activities, on December 10, 2007, Bienstock followed up with Weiss via email, as he was awaiting some resolution to this outstanding matter, including clarification as to what processes should be followed with respect to addressing Finnegan's unwarranted actions.

### BIENSTOCK IS RETALIATED AGAINST AND UNLAWFULLY TERMINATED FOR WHISTLE BLOWING

98.     On Wednesday, December 12, 2007, Bienstock was terminated from his gainful employment.

99.     Bienstock's firing came about without any warning, notice, reason, justification or excuse.

100.    Bienstock's firing was done in bad faith.

101.    Bienstock's firing is in obvious retaliation for Bienstock's lawful, vociferous and appropriate prompt complaints concerning unlawful and unethical behavior engaged in by Moody's just two days earlier.

102.   Whether or not Finnegan was acting within the law, industry practice and/or the company's guidelines, Bienstock's legitimate complaint should have been addressed in a timely, systematic and thorough fashion.

103.   Bienstock's firing stems from Moody's efforts to cover up Finnegan's errant actions.

## BIENSTOCK'S STELLAR PERFORMANCE AND POSITIVE REVIEWS

104.   There is no support within company documents or otherwise that Bienstock's employment was anything less than stellar and that he was revered by his colleagues, superiors and subordinates alike.

105.   Bienstock has enjoyed a heretofore unsullied reputation and have gained the admiration and respect of his superiors, peers, co-workers, clients and subordinates throughout his long tenure as a Senior Analyst at Moody's and elsewhere.

106.   Any claims that Bienstock's performance is less than adequate is pretextual.

107.   A plain reading of Bienstock's most recent 2007 performance review, given by Finnegan himself, describes Bienstock's overall performance as follows:

> **"Paul continues to show solid analytic and quantitative skills. His rating judgments are sound and well reasoned.  He has a deep understanding and knowledge of all areas of the health care industry, which is very useful during the rating committee process for companies outside of his portfolio.  Paul has strong opinions and is not shy about expressing them in a professional manner.  His conviction**

> **is consistently supported by facts, which leads one to respect his opinion.   He shares his knowledge of the industry willingly with his team members and other constituents."**

108.   A further reading of Bienstock's performance review shows his additional

contributions as follows:

> **"Paul collaborates with his teammates.   He provides generous back-up support to the other healthcare analysts on the team (up to 20 hours per month)"**
>
> **"Paul actively supported our investor outreach in 2006 by participating in the following:**
>
> **October 2006 Healthcare Briefing, November 2006 meetings with equity investors (Chicago), and the December 2006 High Yield Institutional Healthcare Teleconference**
>
> **Based on his participation in the 2006 High Yield Institutional Healthcare Teleconference, Tom Marshella provided the following feedback to Patrick Finnegan via e-mail:**
>
> **Our 12th and final Leveraged Finance Monthly Teleconference was held on December 13.   It was well attended, listener retention was strong, and for the 5th consecutive months, there were questions!  Dean Diaz and Paul Bienstock were well prepared and focused."**

109.   Also, as further confirmation of Bienstock's stellar performance and

exemplary work ethic, on July 1, 2007, Bienstock received a 3% pay raise, which was at

or above the average salary increase for Moody's employees and analysts in the corporate finance group.

## MOODY'S EXCUSES FOR TERMINATING BIENSTOCK'S EMPLOYMENT ARE PRE-TEXTUAL

110.   By letter dated December 18, 2007, Moody's claimed that Bienstock was terminated based upon "an overall assessment of his job performance in comparison with similarly situated employees."

111.   Moody's after-the-fact unsupportable contention is in direct contravention to Finnegan's own words in Bienstock's most recent performance evaluation and is merely pre-textual.

112.   Though Moody's claims to have both written and verbal communications regarding Bienstock's purported poor work performance rankings, no such documentation has been presented to Bienstock or his attorneys despite repeated demand.

113.   Bienstock's firing, merely days before year-end, denies him the opportunity to fully earn his 2007 bonus compensation, which would have exceeded an aggregate of $100,000.

114.   Furthermore, given the consistent history of pay raises Bienstock received, Bienstock would have received an additional, even if modest, increase from his annual salary of $195,529, which would have brought his salary over the $200,000 per year threshold.

115.   Lastly, Bienstock's termination comes merely three months prior to the scheduled vesting of his previously granted Moody's stock options and equity stock grants, which loss equals approximately $25,000.

116.   Consequently, in accordance with Moody's severance pay policy, if one is terminated and  is making over $200,000, they would be entitled to an additional three months of severance pay at the $200,000+ annual rate.  This difference in the severance pay calculation equates to at least $52,000 between Bienstock's current severance of nine months' pay (at his $195,529 per year salary) and the nominal expected 3% salary increase which would have taken him over the $200,000 per year threshold.

117.   It should also be noted that Bienstock was not provided with an opportunity to apply for other positions within Moody's despite his obvious qualifications, capabilities and track record.

118.   The similarly situated co-workers who were retained by Moody's in that round of "lay-offs" are much less qualified, less experienced and were unable to handle the voluminous number of companies Bienstock was assigned (35-40) as well as support the other senior analysts in the group.

119.   Indeed, from an economics standpoint, Moody's got the biggest bang for its buck with Bienstock, as he was doing the work of two analysts.

120.   There was no legal or business justification to terminate Bienstock's gainful employment.

121.   Throwing Bienstock into this pool of "restructured" terminated employees makes no logical business sense and further supports Bienstock's contention that he was

retaliated against in violation of the Whistle Blower protections afforded research analysts in various recently enacted laws, Sarbanes-Oxley included.

### POST-EMPLOYMENT

122.    Since Bienstock's unlawful termination from Moody's, Moody's has withdrawn its rating on Express Scripts.

123.    Since Bienstock's recommendation at the December 4, 2007 Ratings Committee meeting, Express Scripts performance has been stellar, supporting Bienstock's original research, analysis and recommendation.

124.    Other rating agencies, Standard & Poor's and Fitch's, have rated Express Scripts at Baa2 equivalent.

### BIENSTOCK FILES WITH OSHA

125.    On February 4, 2008, Bienstock filed a complaint under Section 806 of the Corporate and Criminal Fraud Accountability Act of 2002, Title VII of the Sarbanes Oxley Act of 2002, 18 U.S.C.A. § l5l4A with OSHA. The Complaint was docketed by OSHA as Case Number 2-4173-08-027.

126.    Bienstock filed her OSHA Complaint within 90 days of his retaliatory constructive discharge.

127.    Over 180 days has elapsed since such claim has been filed. Accordingly, all jurisdictional requisites to bring this suit have been satisfied.

## CLAIMS AND DAMAGES

128.     Based upon the above allegations, Bienstock maintains the following legal claims against Defendants:

### COUNT ONE
(Retaliation in Violation of 18 U.S.C. § 1514A)

129.     Bienstock repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

130.     Defendants are contractors and/or subcontractors of companies that are required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. § 780(d)) within the meaning of 18 U.S.C. § 1514A.

131.     Plaintiff is an employee of the Defendants within the meaning of 18 U.S.C. § 1514A.

132.     The information Plaintiff provided to his supervisors regarded conduct which Bienstock reasonably believed constitutes violations of rules or regulations of the Securities or Exchange Commission and/or provisions of Federal law relating to fraud against shareholders and/or banking fraud.

133.     The supervisors to whom Bienstock provided such information (detailed above) each had supervisor authority over Bienstock and/or had authority to investigate, discover, or terminate misconduct.

134.     In providing this information to his supervisors, Bienstock engaged in protected conduct.

135.    The timely Complaint Bienstock filed with OSHA (detailed above) related to an alleged violation of rules or regulations of the Securities and Exchange Commission and/or provisions of Federal law relating to fraud.

136.    Bienstock's managers responsible for the discriminatory and retaliatory actions and/or harassing conduct were aware of Bienstock's protected conduct.

137.    Moody's terminated Bienstock's employment because of and in retaliation for his lawful and protected acts of providing this information to managers and government agencies and/or for filing his Complaints under 18 U.S.C. § 1514A.

### ATTORNEY'S FEES AND COSTS

138.    Attorney's fees and costs are warranted in this matter as the undersigned, on behalf of Bienstock have in good faith, attempted to negotiate a reasonable resolution with Defendants without having to refer this matter to this forum for adjudication, determination and final resolution on the merits.

### PUNITIVE DAMAGES – BAD FAITH

139.    It is presumed that parties to contracts undertake their respective obligations in good faith, with intent to deal fairly.  In light of Defendants' obvious and blatant bad faith, wrongdoing and breach of other duties, punitive damages should be assessed against Defendants so that it be deterred from attempting such harmful employment practices in the future.

## REQUEST FOR RELIEF

**WHEREFORE**, Bienstock requests that this Court order the following relief in favor of Bienstock:

    I.    On Count One in the amount of not less than $5,000,000 plus interest and costs;

    II.    An award of prejudgment interest, costs, punitive damages (where applicable) and attorney's fees; and

    III.    Such other and further relief that the Court may deem just and proper.

## JURY DEMAND

Bienstock demands a trial by jury of all issues triable by jury in this action.

Dated: New York, New York
       March 25, 2009

Respectfully submitted,

**SACK & SACK, ESQS.**

By:      _____
               Jonathan S. Sack, Esq.  (JSS-1835)

Attorneys for Plaintiff
110 East 59th Street, 19th Floor
New York, New York 10022
Tel.: (212) 702-9000
Fax: (212) 702-9702