UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- x
: 
**PAUL BIENSTOCK**,                                    :          Civ No.  09-2858 (SHS-RLE)
:
Plaintiff,                           :
:
- against -                              :
:
**MOODY'S INVESTORS SERVICES** and          :
**MOODY'S CORPORATION**,                       :
:
Defendants.                          :
:
------------------------------------------------------------------- x

| **PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| --- |

**S A C K  &  S A C K ,  E S Q S .**

Attorneys for Plaintiff

110 East 59th Street, 19th Floor
New York, New York 10022-2050
(212) 702-9000

## TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................I

TABLE OF AUTHORITIES .......................................................................................II

PRELIMINARY STATEMENT ..................................................................................1

STATEMENT OF FACTS ...........................................................................................2

I.      Bienstock's Employment & Duties ..................................................................2

II.     December 4, 2007 Ratings Committee Meeting – Express
        Scripts..................................................................................................................3

        A.      BIENSTOCK'S PRESENTATION ............................................................3
        B.      THE "FIRST" VOTE ..................................................................................3
        C.      UNORTHODOX "SECOND" VOTE ........................................................5
        D.      BIENSTOCK'S FRUSTRATION ..............................................................6

III.    Bienstock Complains and an "Investigation" Ensues ...................................7

IV.     Bienstock's Termination ..................................................................................10

V.      Finnegan's Suspicious "Retirement" .............................................................11

ARGUMENT ...............................................................................................................12

I.      Standard Of Review ........................................................................................12

II.     Mr. Bienstock Is Terminated In Retaliation For His
        Lawful Complaints In Violation Of Sox .......................................................13

        A.      DEFENDANTS  CONCEDE  MR.  BIENSTOCK  ENGAGED  IN
                PROTECTED ACTIVITY AND SUFFERED AN UNFAVORABLE
                PERSONNEL ACTION ............................................................................14
        B.      DEFENDANTS  KNEW  OF  MR.  BIENSTOCK'S  PROTECTED
                ACTIVITY AT THE TIME OF HIS TERMINATION..............................14
        C.      MR.   BIENSTOCK'S   PROTECTED   ACTIVITY   WAS   A
                CONTRIBUTING FACTOR AT THE TIME HIS TERMINATION WAS
                FINALIZED ..............................................................................................16

III.    Mr. Bienstock's Termination Was A Result of His
        "Whistleblowing" And Not Based On His Performance................................19

CONCLUSION ...........................................................................................................22

# TABLE OF AUTHORITIES

**CASES**

Akseizer v. Kramer, 265 A.D.2d 356, 696 N.Y.S.2d 849 (2nd Dep't 1999) ................................ 12

Alvarez v. Prospect Hosp., 501 N.E.2d 572, 508 N.Y.S.2d 923 (1986) ........................................ 12

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S.Ct. 2505 (1986) ............................. 13

Andre v. Pomeroy, 320 N.E.2d 853, 362 N.Y.S.2d 131 (1974) .................................................... 12

Binder v. Long Island Lighting Co., 57 F.3d 193, 200 (2d. Cir. 1995) ........................................ 18

Collins v. Beazer Home USA, Inc., 334 F.Supp.2d 1365 (N.D.Ga.2004) ................................... 19

Cramer v. Devon Group, Inc., 774 F.Supp. 176 (S.D.N.Y. 1991) ................................................ 13

Daliendo v. Johnson, 147 A.D.2d 312, 543 N.Y.S.2d 987 (2nd Dep't 1987) ............................... 12

Epstein v. Scally, 99 A.D.2d 713, 472 N.Y.S.2d 318 (1984) ....................................................... 13

Esteve v. Abad, 271 A.D. 725, 68 N.Y.S.2d 322 (1947) .............................................................. 13

Franklin R. Collins v. Beazer Homes USA, Inc., 334 F.Supp.2d 1365, 1375 (N.D.Ga.2004) ......... 14

Fraser v. Fiduciary Trust Company International, 417 F.Supp.2d 310, 321 (S.D.N.Y. 2006) ......... 14

Leo v. Gugliotta, 212 A.D.2d 761, 624 N.Y.S.2d 856 (2nd Dep't 1995) ...................................... 12

Louniakov v. M.R.O.D. Realty Corp., 282 A.D.2d 657, 724 N.Y.S.2d 70 (2nd Dep't 2001) ....... 12

Mahony v. Keyspan Corp., 2007 WL 805813, at *5 (E.D.N.Y. Mar. 12, 2007) .................. 16, 19

Marano v. Dep't of Justice, 2 F.3d 1137, 1140 (Fed.Cir.1993) ................................................... 16

Millerton Agway Cooperative v. Briarcliff Farms, Inc., 215 N.E.2d 341, 268 N.Y.S.2d 18 (1966)
................................................................................................................................................ 13

Negri v. Stop & Shop, Inc., 480 N.E.2d 740, 741, 491 N.Y.S.2d 151, 152 (1985) ..................... 12

Sillman v. 20th Century-Fox Film Corp., 144 N.E.2d 387, 165 N.Y.S.2d 498 (1957) ............... 13

Stone & Webster Eng'g Corp. v. Herman, 115 F.3d 1568, 1572 (11th Cir.1997) ....................... 20

# PRELIMINARY STATEMENT

Plaintiff, Paul Bienstock ("*Bienstock*" or "*Plaintiff*"), by his attorneys Sack & Sack Esqs., hereby respectfully submits this Memorandum of Law in opposition to Defendants' Motion for Summary Judgment ("*Defendants' Motion*").

After discovery, depositions and motion practice, one question remains unresolved for a jury to determine: Was the final decision to terminate Mr. Bienstock made prior to his engaging in protected activity.  While Moody's proffers an affidavit with two suspect exhibits that attempt to prove the decision to terminate Mr. Bienstock pre-dates his engaging in protected activity, testimony from the protagonist in this saga, Mr. Bienstock's boss, Patrick Finnegan, confirms otherwise.

What is undisputed is that Mr. Bienstock engaged in lawful protected activity on December 5, 2007, was terminated on December 12, 2007, and what followed was a charade of an investigation that looks more like a cover-up and clean-up than a legitimate investigation into wrongful and unlawful activity.

This case is anything but resolvable on dueling memoranda of law.  At best, Defendants' excuses, arguments and proffer of affidavits contradicting both deposition testimony and Plaintiff's allegations, does not justify summary judgment, but rather, only concludes that the merits of this case need to be resolved by the fact finding jury.

For the reasons set forth herein, Plaintiff requests that this Honorable Court deny Defendants' Motion in its entirety.

## STATEMENT OF FACTS

### I.        Bienstock's Employment & Duties

Beginning from September 13, 2004, through his unlawful and retaliatory termination on December 12, 2007, Paul Bienstock was employed by Moody's as a Vice President and Senior Analyst.  (See, Complaint ¶30, Bienstock Tr. at 57.)

As a senior analyst at Moody's, a Nationally Recognized Statistical Rating Organization (NSRO), Mr. Bienstock's primary responsibility was to manage a portfolio of over 40 companies in the medical device and healthcare services sub-sector; more than *double* those of his similarly situated colleagues who were responsible for portfolio of healthcare names.  (See, Complaint ¶35.)  (Mr. Bienstock's immediate supervisor, Patrick Finnegan, minimizes Mr. Bienstock's responsibilities, and notes that Mr. Bienstock was responsible for only 30 to 35 companies in the healthcare sector.)  (Finnegan Tr. at 39.)

In preparation for recommending an affirmation or change of a company's rating and/or outlook concerning a particular company grade rating, he would develop an extensive and thorough research package for review by the Rating Committee to support his conclusions.  Mr. Bienstock would then present support for his recommendation in front of a Rating Committee consisting of himself, a Rating Chair, the back-up analyst, the associate analyst, and other analysts who were part of his group.  (See, Complaint ¶40.)  The rating committee would then vote and determine by a majority tally the status of the rating.

## II.         December 4, 2007 Ratings Committee Meeting – Express Scripts

### A.      BIENSTOCK'S PRESENTATION

On December 4, 2007, Mr. Bienstock presented the company, Express Scripts, Inc., to the Rating Committee for consideration of upgrading the company's bond rating from Ba1 to one notch above, Baa3 (the "*December 4th Meeting*").  (Finnegan Tr. at 51.)  Most of the rating committee members present at the December 4th Meeting were already familiar with Express Scripts as one rating discussion and one rating committee meeting had already been previously convened in October 2007, but no vote was taken at that time.  (See, Complaint ¶48; Bienstock Tr. at 100-103; Finnegan Tr. at 53.)

As was his usual practice, prior to the December 4th Meeting, Mr. Bienstock provided Finnegan with a complete 'ratings committee package' that summarized Mr. Bienstock's research, findings and rationale for his conclusions.  (Finnegan Tr. at 52.)

Present at the December 4th Meeting was a ratings committee made up of Patrick Finnegan (the Chair and Mr. Bienstock's immediate supervisor and boss of five years), Paul Bienstock (presenter), Diana Lee, Kendra Smith, Richard Baldwin, Michael Levesque and Elaine Francolino. (Bienstock Tr. at 192-193; Finnegan Tr. at 54-55.)  Mr. Bienstock's junior associate, Raj Salgia, was also present.  (Finnegan Tr. at 55.)

Mr. Bienstock's initial presentation lasted approximately 20 to 30 minutes, with a total of 75 minutes of presentation time that included, Q&A and discussion participation by all committee members present.  (Bienstock Tr. at 125-124; Finnegan Tr. at 58-59.)

### B.      THE "FIRST" VOTE

After Mr. Bienstock's comprehensive, thoughtful and well-reasoned presentation concerning his recommendation of upgrading Express Scripts' rating, Mr. Bienstock's analysis

- 3 -

and quantitative market indicators confirmed a recommendation of a ratings upgrade.  (See, Complaint ¶57.)

Notably, after extensive discussion, but *before* the first vote, Finnegan, as Chair, asked the committee members if there was a need for further discussion or if any points needed further clarification before they voted.  (Finnegan Tr. at 75.)

The initial vote of the Rating Committee was "five" in *favor* of the recommendation for upgrade and "two" *against* the recommendation.  (See, Complaint ¶58; Bienstock Tr. at 194; Finnegan Tr. at pg. 60.)

The initial "five" members in favor of the upgrade, according to Mr. Bienstock's testimony, were Bienstock, Lee, Smith, Baldwin and Francolino.  (Bienstock Tr. at 194.)

According to Finnegan's *conflicting* testimony, Francolino *did not* vote, but rather left the meeting early.  (Finnegan Tr. at 54-55.)  Finnegan claims Mr. Bienstock's junior analyst, Raj Salgia, voted in favor of the upgrade, though his vote did not count.  (Finnegan Tr. at 55.)

Finnegan, as Chair of the meeting, was the last to vote.  (Finnegan Tr. at 78.)  By that time, given the majority of "five" votes cast in favor of the upgrade, and one vote against the upgrade (cast by Levesque), Finnegan knew that the casting of his vote against the upgrade would be of no consequence since a majority vote is all that is required.  (See, Complaint ¶60; Bienstock Tr. at 194-195; Finnegan Tr. at 77-78.)

Finnegan immediately expressed to the Rating Committee and everyone present that he "would not feel comfortable going forward with the committee's decision" and threatened to

appeal the decision of the rating committee to the Chief Credit Officer if the vote was not changed.  (Complaint ¶66; Bienstock Tr. at 196; Finnegan Tr. at 61-62.)

Finnegan then proceeded to sternly and shockingly proclaim to all present at the December 4th Meeting several unlawful and inappropriate comments before calling for a second vote.

First, Finnegan noted that, "**Express Scripts doesn't pay us [Moody's] and we don't cover their issues.  They don't visit us and they don't deserve our upgrade.**"  (<u>See</u>, Complaint ¶69; Bienstock Tr. at 109, 196-197.)

Finnegan also admits to proclaiming that Moody's does not rate any debt of Express Scripts.  (Finnegan Tr. at 70-71.)  Gail Weiss, a compliance officer for Moody's who purportedly investigated the events of the December 4th Meeting, confirmed this proclamation.  (Weiss Tr. at 64, Ex. 1.)

Furthermore, Finnegan stated that, "It wasn't the practice of Moody's to upgrade corporate family ratings to investment grade, which was Mr. Bienstock's recommendation." (Finnegan Tr. at 70.)  However, Finnegan could not articulate where such practice is stated.  Id.

## C.    <u>UNORTHODOX "SECOND" VOTE</u>

In his history of attending hundreds, and possible a thousand, rating committee meetings while at Moody's from September 1993 through February 2008, only *twice* did Finnegan actually appeal a vote, and in both instances he was overruled.  (Finnegan Tr. at 72.)

Therefore, prior to adjourning the December 4th Meeting, Finnegan sought his only opportunity to sway the voting process and immediately called for a "second" vote, which is

contrary to all ethical, company and industry regulations, protocols, standards and guidelines. (<u>See</u>, Complaint ¶76; Bienstock Tr. at 109.)

Finnegan's request for another vote was especially suspect considering that all of the issues Finnegan raised at the conclusion of the first vote were issues that were fully vetted during the first 70 minutes of discussion amongst the members of the committee prior to the first vote being taken.   (Weiss Tr. at 64.)

Remarkably, in an incredible reversal, and without any further substantive discussion or presentation of additional materials or data, upon the unprecedented "re-vote", the other Rating Committee members (all of whom were subordinates of Finnegan) *flip-flopped*; this time voting "six" against and "one" for a "no change" in the ratings for Express Scripts.  (Complaint ¶77; Weiss Tr. at 64.)

### D.   <u>BIENSTOCK'S FRUSTRATION</u>

As an experienced senior member of the healthcare sector, Mr. Bienstock was both distraught and mortified by Finnegan's unlawful actions.  The presentation of a fully researched recommendation for Express Scripts that resulted in a majority vote in one instance was completely reversed without any research or support or foundation in violation of rules, regulations and policy in effect.  (<u>See</u>, Complaint ¶87.)  Finnegan could have easily appealed the outcome of the first vote, but didn't.

In his history at Moody's, Mr. Bienstock conducted approximately 100 ratings committees per year, and approximately 50% of them were attended by Finnegan, yet prior to the December 4th Meeting, Mr. Bienstock and Finnegan *never* had a disagreement as to the

conclusion of Mr. Bienstock's findings *except* with respect to this one Express Scripts' rating. (Bienstock Tr. at 88-89.)

### III.       Bienstock Complains

The following day, on December 5, 2007, Mr. Bienstock complained to Scott McCleskey, Head of Compliance at Moody's, about the preceding day's events and Finnegan's violations of NSRO guidelines.   (See, Complaint ¶92; Bienstock Tr. at 150-151.)   Moody's concedes that Mr. Bienstock's complaints to McClesky on December 5, 2007, constitutes protected activity.

### IV.       Bienstock Is Retaliated Against

On December 12, 2007, within days of Mr. Bienstock's complaints to compliance concerning the December 4th Meeting, Mr. Bienstock was terminated from his gainful employment at Moody's.   (See, Complaint ¶98.)   According to Moody's, Bienstock was terminated as part of a Reduction-In-Force based upon his prior performance evaluations; but this too is unfounded and circumspect.

### V.       Sharade Investigation Ensues

Following the communication to Finnegan on or around December 5, 2007 that Mr. Bienstock was to be terminated, Moody's engaged in a calculated effort to create the *illusion* that some investigation was being conducted into Mr. Bienstock's complaints even though he has been terminated.  Suspiciously, as described below, the investigation that was supposedly led by compliance involved heavy participation by Moody's legal team and little follow-up into Mr. Bienstock's substantive allegations.  Also, interestingly, Mr. Bienstock was never interviewed during the entire investigation, and Finnegan, after 15 years of continued employment at Moody's, mysteriously and suddenly resigned within two weeks of the conclusion of the

investigation, only to be unemployed for months thereafter.  Only after the conclusion of the investigation was Mr. Bienstock finally invited to be interviewed.  (Weiss Tr. Ex. 19.)

The purported "investigation" began on December 5, 2007, when McCleskey referred Mr. Bienstock's complaints about the December 4th Meeting to Gail Weiss, a compliance officer with Moody's.  (Weiss Tr. at 49.)  That same day, Ms. Weiss and Mr. Bienstock had a brief telephone conversation.  During this conversation, Mr. Bienstock recounted to Ms. Weiss that during the December 4th Meeting, Finnegan "exerted undue influence" over the committee and that if the committee members did not re-vote or re-think their votes, Finnegan was going to appeal the committee's conclusion.  (Weiss Tr. at 52.)

Subsequent to this brief telephone conversation, Mr. Bienstock was *never again* interviewed by anyone during the investigation of the December 4th Meeting.  (Weiss Tr. at 112.) Furthermore, Ms. Weiss did not share her notes from that conversation with anyone.  (Weiss Tr. at 67, Ex. 2.)

The next day, around December 6, 2007, Ms. Weiss spoke with Tom Marshella, Finnegan's boss, concerning Mr. Bienstock's description of the December 4th Meeting.  (Weiss Tr. at 56.)  Marshella told Weiss that he was going to ask a few people "discretely" about what transpired at the December 4th Meeting.  (Weiss Tr. at 67.)

Following his own inquiry into the December 4th Meeting, Marshella learned that the process employed by Finnegan at the meeting was "a bit one-off", by threatening to appeal the decision of the first vote if the second vote does not turn out a particular way.  (Weiss Tr. at 70-71, Ex. 2.)  Marshella noted that Finnegan could have managed the process better and told Weiss that he will speak to Finnegan about managing the process.  (Weiss Tr. at 71.)  He never did.

(See, Finnegan Tr. at 82-83.)  The first time anyone spoke to Finnegan concerning the December 4th Meeting was Ms. Weiss in January 2008.  (Finnegan Tr. at 82-83.)

Following Ms. Weiss' meeting with Marshella, she, and Dana Weinshank, from human resources, began scheduling interviews with certain members of the ratings committee in attendance at the December 4th Meeting.  However, even though the investigation was being handled by compliance and human resources, it was being orchestrated by Moody's in-house counsel. (Weiss Tr. at 79.)

Moody's legal department played an <u>integral role</u> in controlling and managing the investigation process.  For example, they prepared talking points for Weiss' interviews, were regularly updated during the course of the investigation and even assisted in preparing and finalizing the conclusions of the investigation, which amazingly found no wrongdoing.  (Weiss Tr. at 79, 81, 102, 108, Ex. 15.)

Confirmation of legal's orchestration into the "investigation" was the establishment of the contrived term "subset rating committee meeting" used in legal's proposed talking points provided to Ms. Weiss to excuse away the impropriety of a re-vote by characterizing the first vote as some sort of "unofficial poll."  (Weiss Tr. at 82, Ex. 4).  Legal's *back-pedaling explanation* of Finnegan's behavior (*i.e.*, a desperate a call for a second vote) is stymied by Finnegan himself who admits he "never heard of the term 'subset committee.'"  (Finnegan Tr. at 72.)  Ms. Weiss herself, who is employed in Moody's compliance department, also never heard of the term "subset committee."  (Weiss Tr. at 82.)

In a desperate attempt to be consistent with legal's attempts to justify the two-vote impropriety at the December 4th Meeting, Weiss suggests that the first vote at the December 4th

Meeting was a "poll" or "straw vote." (Weiss Tr. at 38-39.) There is, however, no basis for this belief, as Finnegan himself admits that the "first vote" was a legitimate vote sought to be appealed unless a new vote is taken. (Finnegan Tr. at 66.)

Finnegan was eventually interviewed but revealed that the investigation was focused more on the communications Finnegan had in general with his direct reports and not so much on the events of the December 4th Meeting. (Finnegan Tr. at 86.)

At the conclusion of the "investigation," compliance, in conjunction with legal, found Finnegan's actions to be inappropriate but not unlawful. Finnegan claims he was not reprimanded. (Finnegan Tr. at 89-90.)

## VI.    BIENSTOCK'S TERMINATION

On or about December 5, 2007, the same day McClesky met with Mr. Bienstock, Finnegan confirmed that Mr. Bienstock was going to be terminated from Moody's. (Finnegan Tr. at 98.)

However, when Mr. Bienstock was terminated, his original severance agreement provided on December 12, 2007 contained no language concerning being terminated as part of a Reduction-In-Force ("*RIF*"). The first time Mr. Bienstock ever saw a severance agreement consisting of Reduction-In-Force language was during his deposition. (Bienstock Tr. at 211-212, Ex. 8.)

It took months for Moody's to provide any documentation that purports that Mr. Bienstock was subject to a RIF, despite counsel's demands, even though such information is very accessible to Moody's compliance.

## VII.    FINNEGAN'S SUSPICIOUS "RETIREMENT"

Though Moody's claims to have found no wrongdoing stemming from Finnegan's actions, almost immediately following the conclusion of the "investigation" in mid-January 2008, Finnegan was moved out of his position as Team Managing Director to the position of credit officer.  (Weiss Tr. at 129-130.)   In response, Finnegan "resigned" his employment suddenly from Moody's after an impressive near-15 year tenure.  Specifically, on February 4, 2008, within two-weeks of the conclusion of the "investigation", Finnegan claims to have voluntarily resigned from Moody's.  (Finnegan Tr. at 10.)  Despite his purported "resignation", Finnegan received a generous severance package.  (Finnegan Tr. at 23.)  Furthermore, despite his purportedly "voluntary resignation", Finnegan remained unemployed for six months thereafter until August 2008.  (Finnegan Tr. at 10.)

**A R G U M E N T**

I.        **STANDARD OF REVIEW**

For purposes of this motion, the Court must view the evidence, including, documents produced in discovery, in a light most favorable to Plaintiff.  Negri v. Stop & Shop, Inc., 480 N.E.2d 740, 741, 491 N.Y.S.2d 151, 152 (1985)   (When deciding a motion for summary judgment, the court must view the evidence in a light most favorable to the non-moving party and must give that party all of the reasonable inferences which can be drawn from the evidence); see, also, Louniakov v. M.R.O.D. Realty Corp., 282 A.D.2d 657, 724 N.Y.S.2d 70 (2nd Dep't 2001)

As this Honorable Court is already aware, summary judgment is a drastic remedy which will be granted only when it is clear that there are no triable issues of fact.  Alvarez v. Prospect Hosp., 501 N.E.2d 572, 574, 508 N.Y.S.2d 923, 925 (1986); Andre v. Pomeroy, 320 N.E.2d 853, 855, 362 N.Y.S.2d 131, 133 (1974); see also, Akseizer v. Kramer, 265 A.D.2d 356, 696 N.Y.S.2d 849 (2nd Dep't 1999).  Accordingly, the presence of the numerous disputed issues of material facts regarding Plaintiff's allegations of Defendants' purported wrongdoings precludes the granting of summary judgment.  Leo v. Gugliotta, 212 A.D.2d 761, 624 N.Y.S.2d 856, 857 (2nd Dep't 1995); Daliendo v. Johnson, 147 A.D.2d 312, 314, 543 N.Y.S.2d 987, 988 (2nd Dep't 1987)  (The party seeking summary judgment must clearly establish to the court that there are no triable issues of fact.)

Summary judgment is "issue-finding, rather than issue-determination," and thus this Court is precluded from ruling in favor of Defendants' theory that the Defendants did not act with discriminatory intent.  See, Sillman v. 20th Century-Fox Film Corp., 144 N.E.2d 387, 392,

165 N.Y.S.2d 498, 505 (1957), quoting, Esteve v. Abad, 271 A.D. 725, 727, 68 N.Y.S.2d 322, 324 (1947); accord, Epstein v. Scally, 99 A.D.2d 713, 714, 472 N.Y.S.2d 318, 319 (1984).

It is axiomatic that summary judgment is a drastic remedy and should not be granted where triable issues of fact are raised and cannot be resolved on conflicting affidavits.  See, Millerton Agway Cooperative v. Briarcliff Farms, Inc., 215 N.E.2d 341, 343m 268 N.Y.S.2d 18, 21 (1966);  Sillman v. 20th Century-Fox Film Corp., 144 N.E.2d 387, 404, 165 N.Y.S.2d 498, 505 (1957);  Epstein v. Scally, 99 A.D.2d 713, 714, 472 N.Y.S.2d 318, 319 (1984).

Finally, in opposing a summary judgment motion a party must offer "concrete evidence from which a reasonable juror could return a verdict in his favor.... [and] may not rest upon mere allegation or denials of his pleadings."  Cramer v. Devon Group, Inc., 774 F.Supp. 176 (S.D.N.Y. 1991), citing, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254, 106 S.Ct. 2505, 2514 (1986).

Based upon the law governing the standard of summary judgment, this Court must deny Defendants' motion for summary judgment as the main issues of fact surrounding the termination of Mr. Bienstock remain in dispute.

## II.   MR. BIENSTOCK IS TERMINATED IN RETALIATION FOR HIS LAWFUL COMPLAINTS IN VIOLATION OF SOX

To assert a whistleblower claim under Section 806 of the Sarbanes-Oxley Act of 2002 ("*SOX*"), Mr. Bienstock "must show by a preponderance of the evidence that (1) [he] engaged in protected activity; (2) the employer knew of the protected activity; (3) [he] suffered an unfavorable personnel action; and (4) circumstances exist to suggest that the protected activity was a contributing factor to the unfavorable action."  Fraser v. Fiduciary Trust Company International,

417 F.Supp.2d 310, 321 (S.D.N.Y. 2006), citing, Franklin R. Collins v. Beazer Homes USA, Inc., 334 F.Supp.2d 1365, 1375 (N.D.Ga.2004) (citations omitted).

**A.     DEFENDANTS CONCEDE MR. BIENSTOCK ENGAGED IN PROTECTED ACTIVITY AND SUFFERED AN UNFAVORABLE PERSONNEL ACTION**

In their Motion, Moody's abandons its original argument concerning the applicability of SOX (which was the basis of their Motion to Dismiss) and concedes that Mr. Bienstock engaged in protected activity and suffered an unfavorable personnel action.  (Def. Mem. at 1, 4.)  Thus, the only issues that remain for purposes of *this* Motion is whether Moody's knew of the protected activity and whether Mr. Bienstock's protected activity was a contributing factor resulting in his termination; both of which require the determination by a fact-finder precluding summary judgment.

**B.     DEFENDANTS KNEW OF MR. BIENSTOCK'S PROTECTED ACTIVITY AT THE TIME OF HIS TERMINATION**

Besides a flawed and contradictory self-serving affidavit supplied by Moody's in desperate support of their motion for summary judgment, there is no basis in the record to support Moody's proposition that Mr. Rowan had no knowledge of Mr. Bienstock's protected activity when the final decision to terminate Mr. Bienstock's employment.

First, there is no conclusive evidence in the record that Mr. Rowan finalized the determination to include Mr. Bienstock in the purported Reduction In Force prior to the time Mr. Bienstock made legitimate complaints concerning protected activity on December 5, 2007. There simply is *no documentation* evidencing when Mr. Rowan *finalized* his determination.  The best evidence Moody's has rebutting the allegation that Mr. Bienstock was retaliated against was the purported "consideration" and contemplation of his termination in late November 2007.

In the text of the affidavit, Rowan points to the November 2007 list (Ex. B) as conclusive evidence that the decision to terminate Mr. Bienstock pre-dates the protected activity.  That is not accurate.  Exhibit B is only a "proposed" list for "discussion."  Hence, the Rowan Affidavit conclusively proves nothing except that a material disputed issue of fact exists to be determined by a fact-finder.

### C. DETERMINING WHEN THE DECISION TO TERMINATE MR. BIENSTOCK IS A DISPUTED ISSUE OF FACT

If the Court would examine the timeline of events, it could not conclude when the decision to terminate Mr. Bienstock was finalized or whether Mr. Finnegan learned about Mr. Bienstock's termination before or after the December 4th Meeting.  The only testimony that exists concerning the final decision to terminate Mr. Bienstock is when Mr. Finnegan revealed that on December 5, 2007, the decision to terminate Mr. Bienstock was final.

Mr. Finnegan testified during his deposition that he was not informed of the decision to terminate Mr. Bienstock's employment until one week prior to Mr. Bienstock's termination. (Finnegan Tr. at 98.)  This places the decision to terminate Mr. Bienstock after he engaged in the protected activity of December 5, 2007.

Mr. Finnegan went on to state that he did not even know why Mr. Bienstock was selected to be part of the Reduction In Force.  Finnegan Tr. at 99.  Mr. Rowan certainly did not provide in his affidavit any specific rationale or matrix as to why Mr. Bienstock was selected for proposed termination or why he was ultimately terminated on December 12, 2007, days after he complained to compliance, concerning serious NSRO violations.

What is missing from Defendants' argument is how Rowan made the decision to terminate Mr. Bienstock based on performance when (1) Mr. Bienstock's performance evaluations were stellar; (2) Mr. Bienstock was performing double the work-load of his similarly

situated colleagues; and (3) Mr. Rowan had little-to-no interaction with Mr. Bienstock, who reported to, none other than, Patrick Finnegan.

In fact, nobody from Moody's could articulate exactly *when* the decision to terminate Mr. Bienstock was finalized.

During Ms. Weinshank's deposition, for example, she testified that the decision could have been in November 2007 and Mr. Finnegan was aware of this possibility.  (Weinshank Tr. at 19-20.)  Mr. Finnegan, on the other hand, places the final decision to terminate Mr. Bienstock at one week before Mr. Bienstock's December 12th termination; which is December 5th; the same date Mr. Bienstock complained to Compliance.  (Finnegan Tr. at 98.)

Such inconsistencies as to a material issue of fact precludes summary judgment.

### D.   MR. BIENSTOCK'S PROTECTED ACTIVITY WAS A CONTRIBUTING FACTOR AT THE TIME HIS TERMINATION WAS FINALIZED

Mr. Bienstock contends that his engaging in protected activity was a contributing factor to his termination.  The words "a contributing factor" mean any factor which, alone *or in connection with other factors*, tends to affect in any way the outcome of the decision.  Marano v. Dep't of Justice, 2 F.3d 1137, 1140 (Fed.Cir.1993).

One consideration in proving causation is the temporal proximity between the protected activity and the unfavorable personnel decision.  See, Mahony v. Keyspan Corp., 2007 WL 805813, at *5 (E.D.N.Y. Mar. 12, 2007); 29 C.F.R. § 1980.104(b).  In this instance, the temporal proximity in time is too suspicious to be disposed of by motion.

Moody's contends that there is no evidence that Mr. Bienstock's engaging in protected activity was a contributing factor in his termination.  The disputed evidence in the record suggests otherwise.  As argued, *supra*, Moody's cannot establish, for purposes supporting

summary judgment, that the final determination concerning Mr. Bienstock's employment was completed *prior* to his engaging in protected activity.

The mere fact that Mr. Bienstock's termination comes days following his complaint speaks volumes.

Furthermore, there are genuine disputed issues of material fact regarding: (1) the reasons behind the termination of Mr. Bienstock's employment; (2) who was actually terminated by Moody's pursuant to the alleged Reduction in Force; and (3) whether Moody's conducted an investigation following Mr. Bienstock's lawful complaints.

For example, during his deposition, Mr. Bienstock testified that there is no language about a Reduction In Force package in his Separation Agreement and that he did not know he was being terminated in connection with any purported Reduction In Force.  Bienstock Tr. at 211-212, Ex. 8.  Mr. Bienstock was told that he was supposedly included in a Reduction In Force weeks after he was actually terminated.  Id.

Furthermore, it is undisputed that Mr. Bienstock's employment was terminated merely days after his complaints, and weeks before an internal investigation by Moody's was even completed.  In fact, Dana Weinshank, an Assistant Vice President in Moody's Human Resources Department who participated in the investigation of Mr. Bienstock's complaints, did not begin her investigation until weeks after Mr. Bienstock's termination.  Weinshank Tr. at 39-40.  When Mr. Bienstock was finally invited to participate in the investigation, the investigation had already been concluded.

### E.    MR. BIENSTOCK'S PARTICIPATION IN A RIF IS PRE-TEXTUAL

As argued *supra*, Moody's cannot conclusively prove that the motivating factor behind the final decision to terminate Mr. Bienstock resulted from a RIF.

To the contrary, Moody's actions following Mr. Bienstock's engaging in protected activity further supports a cover-up and pre-text behind Mr. Bienstock's termination.   See, Binder v. Long Island Lighting Co., 57 F.3d 193, 200 (2d. Cir. 1995)(trier of fact can "generally infer discrimination when it finds that the employer's explanation is unworthy of credence.")

Here, the record is rife with inconsistencies concerning the "investigation" into Mr. Bienstock's complaints and doubts as to the legitimacy of the investigation itself.

For example, Mr. Bienstock was never interviewed during the entire investigation. (Weiss Tr. at 112.)  Once he was finally invited to participate in the investigation, Moody's had already published its conclusion.

Moreover, even though Moody's claims no wrongdoing was found, Mr. Finnegan was moved out of his position of five years as Team Managing Director merely two weeks after the conclusion of the investigation.   (Weiss Tr. at 129-130.)   This resulted in Mr. Finnegan's "voluntary resignation" on February 4, 2008 ending a nearly 15-year run at Moody's.   Upon his resignation, Mr. Finnegan received a 2007 Bonus and the granting of a generous severance package.  (Finnegan Tr. at 10, 23.)

Also suspect in the Bienstock saga is the integral role Moody's legal department played in an investigation that was being conducted by Moody's compliance department.   It is undisputed that the legal department prepared talking points for the investigation, received regular updates and even participated in the drafting of the investigation's conclusion.  (Weiss Tr. at 79, 81, 102, 108, Ex. 15.)

As a testament to Moody's wrongdoing, legal tries to back-pedal the impropriety of the two-vote process by including contrived terms in its talking points such as "subset rating

committee meeting" as a substitute for the "first vote" – a term unheard of by Mr. Finnegan and Ms. Weiss.

In addition, there is no evidence in the record that establishes that everyone proposed for termination in November 2007 was indeed terminated.  The only evidence that Defendants can point to is the list attached to Mr. Rowan's Affidavit (Exhibit B) as the other employees who were "proposed" to be terminated as part of a broad Reduction In Force.  However, the other names, besides Mr. Bienstock, are redacted and there is no documentation that other employees were actually terminated or when they were terminated.  Where is the **final** list that states that Mr. Bienstock is to be terminated as part of the Reduction In Force?

Even if Mr. Bienstock was *slated* for termination, the Court cannot disregard the temporal proximity between Mr. Bienstock's complaints and the termination of his employment.

Mr. Bienstock's termination following his lawful complaints still falls squarely within a violation of SOX as Mr. Bienstock has suffered an adverse employment action and was treated differently than his similarly situated peers by being discriminated in retaliation for his engagement in protected activity.

## III.    MR. BIENSTOCK'S TERMINATION WAS A RESULT OF HIS "WHISTLEBLOWING" AND NOT BASED ON HIS PERFORMANCE

As discussed, *supra*, Moody's cannot demonstrate with clear and convincing evidence that it "would have taken the same unfavorable personnel action against Bienstock in the absence of [protected] behavior."  Mahony v. Keyspan Corp., 2007 WL 805813, at *5 (E.D.N.Y. Mar. 12, 2007).  At best, it is a disputed fact precluding summary judgment.

This standard required by SOX is even more stringent than the already "tough standard" that employers face in other employment discrimination cases. See, Collins v. Beazer Home USA, Inc., 334 F.Supp.2d 1365 (N.D.Ga.2004) (noting the different evidentiary standards in a

SOX claim)(quoting, Stone & Webster Eng'g Corp. v. Herman, 115 F.3d 1568, 1572 (11th Cir.1997).

Moody's suggests (and hangs its entire defense upon the notion) that Mr. Bienstock was selected for termination for a legitimate business reason.  Moody's argue that because Mr. Bienstock appears on a "list" of employees slated for termination, they are absolved from liability.  This is unfounded and baseless.  On the contrary, the documentation provided by Defendants, taken together with the facts alleged in the Complaint and deposition testimony, further supports claims that Mr. Bienstock's termination was retaliatory.

In a bad-faith attempt to create a false impression that Mr. Bienstock was part of a broader restructuring, Moody's, at best, relies upon an **unmarked**, **untitled**, and **undated** list of 33 people for allegedly made for comparative ranking most of whom were <u>not</u> terminated.  (See, Rowan Aff. Exhibit A.)

Furthermore, Defendants do not provide any clear and unequivocal documentation indicating that Mr. Bienstock was slated for termination in November 2007.

Mr. Rowan's own testimony in his affidavits casts significant doubts as to whether the decision to terminate Mr. Bienstock was indeed made prior to his engaging in protected activity.

First, in October 2007, Mr. Rowan created a list of 33 senior analysts for purposes of ranking them and then selecting the poorer performers for possible termination.  (Rowan Aff. ¶3, Ex. A.)

By November 2007, Mr. Rowan compiled from the list of 33 analysts a list of 7 analysts to be "considered" or "proposed" for termination pending "discussion."  (Rowan Aff. ¶5, Ex. B.) Despite what Mr. Rowan "says" in his affidavit about the November 2007 list, the list itself only has equivocal language concerning termination.

There is no list or other evidence in the record that conclusively proves that the decision to terminate Mr. Bienstock preceded his engaging in protected activity.

After all, Mr. Finnegan testified that he did not learn of Mr. Bienstock's termination prior to December 5, 2007.  It therefore is possible the decision to select Paul Bienstock for termination was made subsequent to his complaints.

Moreover, the clear and unequivocal language in Mr. Bienstock's 2006 Performance Evaluation does not depict a "poor performing" employee that should otherwise be terminated. On the contrary, Mr. Bienstock's performance speaks volumes as to Defendants' contention that Mr. Bienstock was terminated for performance related issues; it renders their argument baseless.

In respect of 2006, Mr. Bienstock received a Business Rating of "3" as he attained a ranking of "3" on all six business objectives for 2006.  Mr. Bienstock also achieved a "3" ranking on 7 competencies for rating analysts and a "4" ranking on one competency for rating analysts.  As a result, it is inconceivable to conclude that he was a poor-performer.  In fact, based on the qualitative comments from his superior, Mr. Bienstock's performance was stellar. Consequently, the 2006 Performance Review does not contain information nor evidence any reason to terminate Mr. Bienstock's employment.

Defendants' reliance upon Mr. Bienstock's purported "poor" performance is misguided and not supported by any evidence in the record.  In fact, any evidence of Mr. Bienstock's performance during his tenure at Moody's is to the contrary.  Therefore, Defendants' contention that Mr. Bienstock was selected for termination solely based upon his performance belies Mr. Bienstock's Performance Evaluations.   Defendants did not have a legitimate business justification to terminate Mr. Bienstock's employment and any reason offered is simply pre-textual.

## <u>CONCLUSION</u>

For the reasons set forth above, specifically because so many material issues of triable fact exist at this stage of the proceedings, this Court should deny Defendants' Motion in its entirety and set this matter down for trial.

Dated:  New York, New York
         September 22, 2010

                              Respectfully submitted,

                              **SACK & SACK, ESQS.**

                              By:     */s/ Jonathan Sack*
                                      Jonathan Sack, Esq.
                              110 East 59th Street, 19th Floor
                              New York, New York 10022-2050
                              (212) 702-9000
                              Attorneys for Plaintiff, **Paul Bienstock**